**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0945-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

TYEHEEM B. ROGERS,

    Defendant-Appellant.

_____

> Submitted January 29, 2026 – Decided February 24, 2026
>
> Before Judges Marczyk and Bishop-Thompson.
>
> On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 21-09-2484.
>
> Alan Dexter Bowman, attorney for appellant.
>
> Grace C. MacAulay, Camden County Prosecutor, attorney for respondent (Rachel M. Lamb, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

    Defendant Tyeheem B. Rogers appeals from the trial court's August 2, 2022 order denying his motion to suppress evidence. This appeal arises from a

warrantless search of a motor vehicle after police obtained consent from its driver following a lawful traffic stop, which uncovered controlled dangerous substances (CDS) and a firearm. Following our review of the record and the applicable legal principles, we affirm.

I.

On July 15, 2021, defendant, Juan Rivera, and Stuart M. Johnson were arrested following a motor vehicle stop and subsequent search. Former Camden County Police Officer Clay Scaffo testified he was part of a neighborhood response division that patrolled "certain neighborhoods that were deemed high[-]crime areas" in order to "be proactive and respond to certain incidents." At approximately 12:50 p.m., he heard a radio dispatch made by Deputy Sergeant Anthony Amato, who was attempting to locate a "newer[-]model black Cadillac sedan."

Sergeant Amato testified he had been patrolling the intersection of Kaighn Avenue and Baring Street, "a priority area for [Camden Police] at the time," because of recent shootings and "other violent crimes" in that area. He spotted several individuals in the middle of the street and a black Cadillac parked nearby with no front license plate and a fully tinted windshield. Sergeant Amato noticed "the people walk off as soon as they observed [his] presence." He later observed

the Cadillac back up to a dirt lot between houses and then travel the wrong direction down a one-way street.

Police subsequently executed a motor vehicle stop based on the Cadillac's tinted windows, N.J.S.A. 39:3-74, and lack of a front license plate, N.J.S.A. 39:3-33. After approaching the driver's side of the vehicle, Sergeant Amato observed Rivera in the driver's seat, Johnson in the passenger seat, and defendant in the rear seat behind the driver. Sergeant Amato testified he observed defendant exhibiting "[n]ervousness, not making eye contact," and further noticed a shoe box in the back seat.

The officers requested the driver's identification and vehicle documentation; Rivera was able to produce the Cadillac's title but not his license or registration. Rivera told Sergeant Amato the vehicle's rear license plate was not registered to the Cadillac, which had recently been purchased, but rather to his van. Prior to obtaining Rivera's consent to search the Cadillac, Sergeant Amato informed him the vehicle could be towed due to the issue with its license plate. Sergeant Amato later asked Rivera for consent to search the vehicle, and Rivera subsequently signed the consent-to-search form. While verifying the

A-0945-23

occupants' identities, Sergeant Amato was advised Rivera "showed up as armed and dangerous" in the police's computer system.[1]

Police subsequently asked the occupants to exit the vehicle, at which time defendant stood up and adjusted his shorts before exiting and attempting to flee. Officers observed a firearm in plain view where defendant had been sitting and found over 400 small blue triangular containers inside of the shoe box containing "a white powdery substance."

In September 2021, defendant and his two co-defendants, Rivera and Johnson, were indicted on eight counts involving CDS and weapon offenses stemming from the motor vehicle stop. Defendant was charged with six of the eight offenses, including: third-degree possession of a CDS, N.J.S.A. 2C:35-10(a)(1) (count one); third-degree possession of a CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(13) (count two); first-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) and 2C:39-5(j) (count four); fourth-degree possession of a large-capacity ammunition magazine, N.J.S.A. 2C:39-3(j) (count five); second-degree possession of a firearm while committing

---

[1] The trial court did not consider this information in its reasonable suspicion analysis because it was obtained after the consent to search the vehicle was made.

A-0945-23

a CDS offense, N.J.S.A. 2C:39-4.1(a) (count six); and second-degree certain persons not to possess firearms, N.J.S.A. 2C:39-7(b)(1) (count eight).

Defendant, joined by his co-defendants, subsequently moved to suppress the evidence seized in the search, specifically challenging the consent to search.[2] Following a hearing, the trial court found the testifying officers "generally credible." Specifically, it found: "With few exceptions, the officers testified consistent[ly] with both the reports and what was shown on their body camera footage. Any discrepancies appeared to have been one of perception[ and] interpretation."[3]

The court determined the initial stop was legal based on the illegally tinted windows and lack of a front license plate, which established "reasonable and articulable suspicion that a traffic offense was being committed." It then addressed whether the officers were justified in requesting a consent to search the vehicle. The court concluded, based on a totality of the circumstances, Sergeant Amato had the requisite reasonable suspicion to request the consent to search. Specifically, it noted, the following "factors r[o]se to a reasonable and

---

[2] Defendants stipulated the initial motor vehicle stop was lawful.

[3] The court determined, based on its review of the video, Johnson did not appear nervous or avoid eye contact. The court did not comment on defendant or Rivera.

A-0945-23

articulable suspicion of ongoing criminality," which justified the consent to request a search:

> 1) the vehicle had [il]legally tinted windows, 2) the vehicle was not proper[l]y registered, 3) the vehicle had an illegal [rear] license plate, 4) the vehicle was in a high[-]crime area, 5) individuals on foot . . . in the vicinity of the vehicle . . . [dispersed] when the police arrived, 6) the vehicle appeared to actively drive away from the police when the officer arrived and, 7) the training and experience of the officer.

Additionally, the trial court determined the "request for consent to search under the totality of the circumstances was not coercive" under State v. King, 44 N.J. 346 (1965), reasoning:

> The manner and conduct of the officer was not threatening. The consent form was clearly read in total, slowly and clearly, and [the driver] voluntarily signed the form. The interaction was not hostile or threatening. Considering the event as shown on video objectively, consent was unequivocally specific, freely, and intelligently given[. T]herefore[,] based on the totality of factors, consent was not forced.

It added, "[a]t no point did Sergeant A[mat]o pressure [Rivera] or otherwise state or imply that he had no choice in the matter." The court concluded:

> Sergeant A[mat]o ha[d] reasonable and articulable suspicion to conduct a traffic stop based on the motor vehicle violation and reasonable and articulable suspicion to request consent to search the vehicle[,] which placed the firearm in plain view and allowed for the subsequent search of the vehicle to reveal the CDS.

6

> The request was not coercive. As a result, the evidence was n[either] obtained in violation of the Fourth Amendment nor . . . obtained in violation of Article One, paragraph seven of the New Jersey Constitution.

After the court denied the motion to suppress, defendant pleaded guilty to first-degree unlawful possession of a weapon, in exchange for the dismissal of the remaining charges against him. On October 13, 2023, consistent with the plea agreement, the court sentenced defendant to a fourteen-year prison term with seven years of parole ineligibility.

II.

Defendant raises the following point on appeal:

> THE TOTALITY OF THE CIRCUMSTANCES DID NOT SUPPORT A REQUEST FOR CONSENT TO SEARCH THE VEHICLE.

The standard of review on a motion to suppress is deferential. State v. Nyema, 249 N.J. 509, 526 (2022). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Ahmad, 246 N.J. 592, 609 (2021) (alteration in original) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). We "defer[] to those findings in recognition of the trial court's 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot

7

enjoy.'" Nyema, 249 N.J. at 526 (quoting Elders, 192 N.J. at 244). "An appellate court should not disturb the trial court's findings merely because 'it might have reached a different conclusion were it the trial tribunal' or because 'the trial court decided all evidence or inference conflicts in favor of one side' in a close case." State v. Nelson, 237 N.J. 540, 551 (2019) (quoting Elders, 192 N.J. at 244). "The governing principle, then, is that '[a] trial court's findings should be disturbed only if they are so clearly mistaken that the interests of justice demand intervention and correction.'" Id. at 551-52 (alteration in original) (quoting State v. Robinson, 200 N.J. 1, 15 (2009)).

When the motion court hears testimony in addition to reviewing an audio/video recording of the encounter, an appellate court's own review of the video recording must not be elevated over the factual findings of the trial court. See State v. S.S., 229 N.J. 360, 374-76 (2017). Importantly, however, "[a] trial court's legal conclusions . . . and its view of 'the consequences that flow from established facts,' are reviewed de novo." Nyema, 249 N.J. at 526-27 (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

Defendant argues the police lacked a sufficient basis to request consent to search the vehicle. He contends the Cadillac's tinted windows and lack of a front license plate, which authorized the stop, did not form a basis to request a consent

8

to search because no additional violations occurred after the stop. Defendant emphasizes the passengers in the vehicle behaved appropriately, and there were no furtive movements or attempts to destroy evidence. He asserts Rivera resisted consenting to the search until he was advised the vehicle "would be seized without regard to whether he signed the consent form." Defendant avers this resulted in Rivera consenting to the search "because he believed he had no other choice." He also contends defendants were profiled based on their race and gender.

"The Fourth Amendment of the Federal Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee the right to be free from unreasonable searches and seizures." Nelson, 237 N.J. at 552 (citing U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7). "Under both Constitutions, 'searches and seizures conducted without warrants issued upon probable cause are presumptively unreasonable and therefore invalid.'" Nyema, 249 N.J. at 527 (quoting Elders, 192 N.J. at 246). As such, "the State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure" falls within an exception. Ibid. (alteration in original) (quoting Elders, 192 N.J. at 246).

Consent is a well-recognized exception to the Fourth Amendment's search warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). To be valid, a consent to search must be voluntary and knowing in nature. Id. at 222. The person giving consent must first be advised of their right to refuse. State v. Johnson, 68 N.J. 349, 353-54 (1975). Additionally, police must have a reasonable and articulable suspicion that a search will produce evidence of criminal activity before requesting a driver's consent to a search following a routine traffic stop. State v. Carty, 170 N.J. 632, 635 (2002); see also State v. Thomas, 392 N.J. Super. 169, 188-89 (App. Div. 2007) (holding the police did have a reasonable and articulable suspicion to seek consent to search a vehicle whose occupants appeared nervous, failed to provide identification, and offered conflicting stories). That determination must be based on an objective evaluation of the circumstances in light of the officer's experience and knowledge, as well as the facts available at the time of the encounter. See State v. Alessi, 240 N.J. 501, 518-23 (2020); State v. Chisum, 236 N.J. 530, 545-46 (2019); State v. Pineiro, 181 N.J. 13, 20-21 (2004); State v. Stovall, 170 N.J. 346, 361 (2002). "[A] finding of reasonable and articulable suspicion of ongoing criminality" is determined by objective "cumulative factors in a totality of the circumstances analysis[.]" Elders, 192 N.J. at 250.

A-0945-23

In Carty, our Supreme Court noted "the Johnson standard has not been effective in protecting our citizens' interest against unreasonable intrusions when it comes to suspicionless consent searches following valid motor vehicle stops." 170 N.J. at 646. It explained, "consent searches following valid motor vehicle stops are either not voluntary because people feel compelled to consent for various reasons, or are not reasonable because of the detention associated with obtaining and executing the consent search." Ibid. Accordingly, the Court "expand[ed] the Johnson . . . standard and h[eld] that unless there is a reasonable and articulable basis beyond the initial valid motor vehicle stop to continue the detention after completion of the valid traffic stop, any further detention to effectuate a consent search is unconstitutional." Id. at 647.

Reasonable suspicion is defined as "a particularized and objective basis for suspecting [a] person stopped of criminal activity." Pineiro, 181 N.J. at 22 (quoting Stovall, 170 N.J. at 356). "There must be 'some objective manifestation that the person [detained] is, or is about to be[,] engaged in criminal activity.'" Ibid. (first alteration in original) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). In State v. Goldsmith, our Supreme Court recently reaffirmed that "[a]lthough reasonable suspicion is a less demanding standard than probable cause, '[n]either "inarticulate hunches" nor an arresting officer's subjective good

11

faith can justify infringement of a citizen's constitutionally guaranteed rights.'" 251 N.J. 384, 399 (2022) (second alteration in original) (quoting Stovall, 170 N.J. at 372).

When determining whether reasonable suspicion exists, a reviewing court must consider "the totality of the circumstances—the whole picture." Nelson, 237 N.J. at 554 (quoting Stovall, 170 N.J. at 361). A reviewing court must not engage in a "divide-and-conquer" analysis by "looking at each fact in isolation." Id. at 555. The reasonable suspicion inquiry, moreover, must account for the officers' background and training, which permits them "to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Ibid. (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)); see also Pineiro, 181 N.J. at 26 ("[T]he reputation or history of an area and an officer's experience with and knowledge of the suspected transfer of narcotics [are] relevant factors to determine the validity of a Terry[4] stop."). In Goldsmith, our Supreme Court reaffirmed presence in a high-crime area is a relevant factor but also emphasized, "[t]he State must do more than simply invoke the buzz words 'high-crime area' in a conclusory manner to justify investigative stops." 251 N.J. at 404.

---

4 Terry v. Ohio, 392 U.S. 1 (1968).

Applying these general principles, we conclude there was sufficient credible evidence in the record to support the court's determination the officers had a reasonable articulable suspicion to request consent to search the vehicle following the lawful traffic stop. While the "mere presence in an area known for its drug activity" in and of itself does not justify reasonable suspicion, State v. Dangerfield, 339 N.J. Super. 229, 238 (App. Div. 2001), the trial court correctly found being in a high-crime area, as here, was a relevant factor under the totality of the circumstances. See Pineiro, 181 N.J. at 22-27 (reviewing precedent). The officers specifically identified the neighborhood as an area of recent shootings and heightened drug activity occurring within the prior weeks, which prompted their patrol and informed their perception of the events.

Further, the court noted the vehicle had illegally tinted windows and windshield, lacked a front license plate, and was attempting to evade police by backing into a dirt lot and traveling the wrong direction down a one-way street. In addition, police observed several individuals congregating near the vehicle as they approached the area; these individuals dispersed upon the officers' arrival. Moreover, the court found the driver's inability to produce his license or the vehicle's registration, and the fact the vehicle had an illegal rear license plate, contributed to the officers' suspicion. Thus, the combination of these factors,

13

viewed in light of the officers' training and experience, established a "reasonable and articulable suspicion of ongoing criminality" at the time of the request. See Elders, 192 N.J. at 250.

We likewise are unpersuaded the officers used coercive tactics to pressure Rivera into signing the consent-to-search form. The record supports the court's finding the officer's request for consent to search the vehicle was not coercive under the totality of the circumstances. Consent must be given "with a free and unconstrained will . . . that is not overborne by physical or psychological duress or coercion." State v. Carvajal, 202 N.J. 214, 226 (2010). The voluntariness of consent is viewed within the totality of the circumstances, including whether the individual was already arrested or handcuffed, whether "consent was obtained despite a denial of guilt," or "only after the accused had [already] refused initial requests for consent to search," or whether "consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered . . . ." King, 44 N.J. at 352-53.

The trial court appropriately considered the King factors in concluding Rivera's consent was knowing and voluntary. Consent was not obtained when Rivera was arrested, Rivera denied there was any evidence of illegal activity in the vehicle, and he was not handcuffed at the time consent was given. Although

A-0945-23

Sergeant Amato advised Rivera the vehicle could be towed due to the registration issue, the court found, in evaluating the factors in conjunction with the body-worn camera footage, the tone and manner of the officers' conduct during the encounter was not coercive, the consent form was "slowly and clearly" read aloud, and Rivera voluntarily signed it. The court concluded the interaction was in no way hostile or threatening. Accordingly, we discern no error in the court's conclusion the consent to search was knowing and voluntary.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division